**RECORD NO. 12-7054**

**ORAL ARGUMENT HAS NOT YET BEEN SCHEDULED**

In The

# United States Court of Appeals

For The District of Columbia Circuit

# IN THE MATTER OF: HOPE 7 MONROE STREET LIMITED PARTNERSHIP,

---------------------------------------------------------------------------------------------------------------------------

# HOPE 7 MONROE STREET LIMITED PARTNERSHIP,

*Appellant*,

**v.**

# RIASO, LLC,

*Appellee*.

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————

## BRIEF OF APPELLANT

———————

**Donald M. Temple**
**TEMPLE LAW GROUP**
**1101 15th Street, NW, Suite 910**
**Washington, DC 10005**
**(202) 628-1101**

*Counsel for Appellant*

THE LEX GROUP[DC] ♦ 1825 K Street, N.W. ♦ Suite 103 ♦ Washington, D.C. 20006
(202) 955-0001 ♦ (800) 856-4419 ♦ Fax: (202) 955-0022 ♦ www.thelexgroup.com

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA

### September Term 2011

### Case Nos.  12-7054

|  |  |
|---|---|
| | **:** |
| Hope 7 Monroe Street | : |
| Limited Partnership, | : |
| -------------------------- | : |
| Hope 7 Monroe Street Limited Partnership | : |
| | : |
|      Appellant | : |
| | : |
|      v. | : |
| | : |
| Riaso, LLC | : |
| | : |
|      Appellee | : |
| _____ | : |

## CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES

Pursuant  to D.C. Circuit Rule 28(a)(1), counsel for Appellant certifies as follows:

     A.     Parties, Intervenor, and Amici Curiae.

     B.     Rulings Under Review.

     The ruling under review is the May 3, 2012 order  the United States District court for the District of Columbia, (Judge James E. Boasberg)  in civil action No. 11cv1455 affirming the Bankruptcy Court's denial of Debtor's Rule 60(b) motion.

     C.     Related Cases

     None.

Respectfully submitted,

*Donald M. Temple*
Donald M. Temple, Esq.
DONALD M. TEMPLE, P.C.
1229 15th Street, N.W.
Washington, DC 20005
202-628-1101
202-628-1149 fax
dtemplelaw@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on the14th day of September 2012 a copy of the foregoing was served by use of the Court's Electronic Filing System, upon the following

Richard Frank Boddie
Slocum & Boddie, P.C.
5400 Shawnee Road
Suite 300
Alexandria, VA 22312

*Donald M. Temple*
Donald M. Temple

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................iii

JURISDICTIONAL STATEMENT.......................................................1

STATEMENT OF ISSUES ON APPEAL...............................................1

STATUTES AND RULES ......................................................................2

STATEMENT OF THE CASE ...............................................................3

STATEMENT OF THE FACTS.............................................................15

SUMMARY OF ARGUMENT ..............................................................29

APPLICABLE STANDARD OF APPELLATE REVIEW ...................30

ARGUMENT ..........................................................................................31

    I.    THE LOWER COURTS ERRED IN DENYING THE DEBTOR'S RULE 60(b)(2) MOTION................................31

        A.    The Evidence Must Have Been In Existence At The Time of Trial .......................................................32

        B.    The New Evidence Could Not Have Been Discovered By The Exercise Of Due Diligence In Time To Present It In The Original Proceeding ..........35

        C.    The Evidence Herein Was Not Merely Cumulative Or Impeaching .........................................40

D.   The New Evidence Was Credible, Admissible, And Of Such a Material and Controlling Nature That It Would Have Changed The Outcome Of The Case ..................................................................... 41

II.   THE LOWER COURTS ERRED IN DENYING THE DEBTOR'S RULE 60(b)(3) MOTION ................................ 43

III.   THE LOWER COURTS ERRED IN DENYING THE DEBTOR'S RULE 60(b)(6) MOTION ................................ 47

CONCLUSION ..................................................................... 51

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF FILING AND SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ackermann v. United States*,
  340 U.S. 193 (1950) ........................................................................48

*Banks v. County of Allegheny*,
  223 Fed. Appx. 149 (3d Cir. 2007) ................................................39

*Bristol Petroleum Corp. v. Harris*,
  901 F.2d 165 (D.C. Cir. 1990) ......................................................30

*Butler v. Pearson*,
  636 F.2d 526 (D.C. Cir. 1980) ......................................................30

*Cain v. Hyatt*,
  101 B.R. 440 (E.D. Pa. 1989)........................................................39

*Cosoff v. Rodman*
  669 F.2d 599 (2d Cir. 1983)....................................................33, 34

*Diaz v. Methodist Hosp.*,
  46 F.3d 492 (5th Cir. 1995)..........................................................44

*Drabkin v. L & L Construction. Assoc.*,
  168 B.R. 1 (D.D.C. 1993) .............................................................46

*Energy Action Educ. Foundation v. Andrus*,
  631 F.2d 751 (D.C. Cir. 1979) ......................................................30

*Chief Authorities are Designated with An Asterisk*

*Feltman v. Prudential Bache Sec.,
    122 B.R. 466 (S.D. Fla. 1990)..........................................41, 42, 46

*Good Luck Nursing Home, Inc. v. Harris
    636 F.2d 572 (D.C. Cir. 1980) .....................................................48

Greater Southeast Community Hosp. Foundation, Inc. v. Potter,
    586 F.3d 1 (D.C. Cir. 2009) ..........................................................30

*In re Lopez,
    283 B.R. 22 (9th Cir. 2002)...........................................................39

In re Korean Air Lines Disaster of September 1, 1983,
    156 F.R.D. 18 (D.D.C. 1994) ........................................................31

*In re Pace,
    146 B.R. 562 (9th Cir. 1992).........................................................39

Lans v. Gateway 2000, Inc.,
    110 F. Supp. 2d 1 (D.D.C. 2000) .................................................31

Liljeberg v. Health Servs. Acquisition Corp.,
    486 U.S. 847 (1988) .....................................................................47

Mayfair Extension, Inc. v. Magee,
    241 F.2d 453 (D.C. Cir. 1957) .....................................................44

Montgomery v. Hall,
    592 F.2d 278 (5th Cir. 1979).........................................................44

*Parker v. Wendy's Int'l, Inc.,
    365 F.3d 1268 (11th Cir. 2004).....................................................39

Richardson v. Nat'l R.R. Passenger Corp.,
    150 F.R.D. 1 (D.D.C. 1993).........................................................44

*S. Technical Coll. V. Hood*,
    89 F.3d 1381 (8th Cir. 1996)........................................................30

*\*Toussaint v. Howard Univ.*,
    2005 U.S. Dist. LEXIS 38738 (D.D.C. Nov. 8, 2005)..................39

*Twelve John Does v. District of Columbia*,
    841 F.2d 1133 (D.C. Cir. 1988) ...................................................48

*\*United States v. Inslaw*, *Inc.*,
    932 F.2d 1467 (D.C. Cir. 1991) ...................................................38

*Washington v. Patlis*,
    916 F.2d 1036 (5th Cir. 1990).......................................................43

## **STATUTES**

11 U.S.C. § 323(b) ..................................................................2, 39

11 U.S.C § 363 ..............................................................................21

11 U.S.C. § 541 ............................................................................38

11 U.S.C. § 541(a)(1) ...............................................................2, 38

28 U.S.C. § 1291 ............................................................................1

## **RULES**

Fed. R. Civ. P. 17 ........................................................................39

Fed. R. Civ. P. 59(b) ...............................................................2, 31

Fed. R. Civ. P. 60 ........................................................................42

Fed. R. Civ. P. 60(b) ......................................................9, 24, 29 30, 37

Fed. R. Civ. P. 60(b)(1)............................................................47

Fed. R. Civ. P. 60(b)(2)......................................... 1, 2, 3, 10, 29,
31, 32, 33, 47

Fed. R. Civ. P. 60(b)(3)............................................... 1, 3, 10,
29, 43, 47

Fed. R. Civ. P. 60(b)(4)............................................................47

Fed. R. Civ. P. 60(b)(5)............................................................47

Fed. R. Civ. P. 60(b)(6).................................... 1, 3, 11, 29, 47

## **OTHER AUTHORITY**

*1 Collier on Bankruptcy* ¶ 5.11 (15th ed. rev. 2009)..............................30

## JURISDICTIONAL STATEMENT

This Court has subject matter jurisdiction to hear this appeal under 28 U.S.C. § 1291. The final order of the District Court that is being challenged on appeal was issued on May 3, 2012. Appellants filed a timely notice of appeal from that order on May 30, 2012.

## STATEMENT OF ISSUES ON APPEAL

I.     Did the lower courts erroneously deny the Debtor's Rule 60(b)(2) motion, by ruling that the new evidence presented "was not 'of such a material and controlling nature' as will probably change the outcome" of either the orders overruling the objection to RIASO's proof of claim and direct payment of that claim, or the order granting the Trustee's motion to sell the claim to Boddie?

II.     Did the lower courts erroneously deny the Debtor's Rule 60(b)(3) motion, on grounds that the Debtor did not show by clear and convincing evidence that the Creditor, RIASO, fraudulently obtained the approval of the settlement by failing to disclose that it was not in fact the creditor and may not have provided the loan funds for the loan to the debtor?

III.   Did the lower courts err in denying Debtor's Rule 60(b)(6) motion, on grounds that "no extraordinary circumstances" existed to justify the requested relief and that the Debtor failed to exercise due diligence in pursuing said relief?

## STATUTES AND RULES

**11 U.S.C. § 323(b)**
(b) The trustee in a case under this title has capacity to sue and be sued.

**11 U.S.C. § 541(a)(1)**
(a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
(1) Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable.

**Fed. Rule Civ. P. 59(b)**
(b) Time to File a Motion for a New Trial. A motion for a new trial must be filed no later than 28 days after the entry of judgment.

**Fed. Rule Civ. P. 60(b)(2)**
(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
(2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b).

**Fed. Rule Civ. P. 60(b)(3)**
(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
(3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party.

**Fed. Rule Civ. P. 60(b)(6)**
(b) Grounds for Relief from a Final Judgment, Order, or Proceeding. On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
(6) any other reason that justifies relief.

## STATEMENT OF THE CASE

The immediate case comes before this Court based upon the District Court's erroneous affirmation of the Bankruptcy Court's denial of Hope 7 Monroe Street Limited Partnership's (the "Debtor") Fed. Rule Civ. P. 60(b)(2), (3), and (6) Motion for Reconsideration. The underlying facts show a defective, hard money real estate loan and transfer of over $4.5 million to unnamed parties through the trust account of a purported Creditor's attorney. At issue here is the source and legitimacy of the loan monies and whether RIASO LLC (the "Creditor") was, in fact, a sham corporation. Notably, the Creditor

3

corporation, irrefutably had no business staff, no bank account, filed no taxes of any kind, and had no documented transactions with any of the third-party loan sources which allegedly provided the loan monies at issue herein. To the extent that the Creditor is a sham corporation, its proof of claim is then void and its actions in the Bankruptcy Court to collect any debt obligation are equally deficient.

On April 2, 2009, the Debtor filed an involuntary petition under Chapter 11 of the Bankruptcy Code, related to the aforementioned hard money loan, which the Debtor borrowed in the amount of $1.6 million from RIASO, a District of Columbia corporation. Lennan and Pauline Cappel (the "Guarantor") were the limited partners and guarantors of this loan. On July 17, 2009, the Bankruptcy Court converted the Debtor's case to a Chapter 7 bankruptcy. Marc E. Albert (the "Trustee") was appointed as the Chapter 7 trustee. The Debtor's only real asset was a multi-family unit apartment building located at 1021 Monroe Street, N.W., in the District of Columbia.

On November 6, 2009, the Debtor and the Guarantor filed a complaint in the District of Columbia Superior Court against the

purported lender, RIASO; the loan broker, Musse Leakemariam ("Leakemariam"); and RIASO's attorney, Richard Boddie ("Boddie"). That case asserted the following claims: (1) Breach of Fiduciary Duty, (2) Fraud, (3) Fraud In The Inducement, (4) Intentional Misrepresentation, (5) Negligent Misrepresentation, and (6) Civil Conspiracy to Commit Fraud. However, since the Debtor could not independently assert a claim absent the authorization of the Trustee, the Cappels filed an amended complaint in their capacity as guarantors and dismissed the Debtor as a party on March 1, 2010.[1] Given the lack of evidence then available, the claims against defendant Boddie were dismissed without prejudice at the Plaintiff's insistence. The factual predicate for the Superior Court case was Leakemariam's fraudulent misrepresentation to the Debtor and the Guarantor; while serving as the loan broker for the project, Leakermariam failed to disclose that he was also a co- owner and manager of RIASO, the purported lender and that his family enjoyed an interest in RIASO. Discovery in that case

---

[1]     Discovery in the Superior Court case was commenced by the Guarantor (not the borrower) consistent with the then issued scheduling order.

commenced through October 2010, six (6) months after the case was filed, pursuant to which the guarantor uncovered evidence that showed that RIASO was a sham corporation. As a sham corporation, RIASO could not file a claim before the Bankruptcy court and thus submitted a legally defective proof of claim.  As a sham corporation RIASO lacked standing.

On January 15, 2010, the Trustee filed a motion to sell the Debtor's assets. On February 17, 2010, the Bankruptcy Court entered an order approving the sale and authorized payment as to RIASO's claims, subject to certain conditions related to the concerns of the building's tenants. That issue was resolved by way of a court order on April 26, 2010.

On February 16, 2010, prior to the Guarantor's filing of an amended complaint in the D.C. Superior Court case, the Debtor dutifully filed an objection to RIASO's proof of claim, in which it asserted that it did "not admit to owing this debt as filed by the creditor RIASO, nor does the debtor admit to owing any amount that is the result of the fraudulent inducement to contract and the breach of fiduciary duty

committed against the debtor." Joint Appendix, Volume I at 153. As a result of this objection, the Bankruptcy court and Trustee were aware of the Debtor's specific objections and the basis therefore. In fact, the Bankruptcy Court noted that the Debtor's objections echoed claims raised by the Guarantor in the Superior Court case. On May 25, 2010, the Bankruptcy Court heard the Debtor's objection to RIASO's proof of claim and on May 28, 2010 entered an order overruling the objection. Notably, at that time, neither the Debtor nor the Bankruptcy Court knew that RIASO was a sham corporation or that it did not have a bank account or may not have been the source of the monies lent to the Debtor. As such, the Bankruptcy Court operated on the faulty premise that RIASO was a bonafide creditor. Thus, the Creditor's proof of claim went unchallenged.

In the interest of pursuing its claims, between the middle of February and early March of 2010, the Debtor entered into negotiations with the Trustee related to Trustee's abandonment of the Debtor's claims against RIASO, Leakemariam, and Boddie. The Debtor's Counsel drafted a formal consent motion which embodied the

discussions and submitted it to the Trustee for his consideration on February 27, 2010. See J.A., Vol. I at 450-58. Rather than abandon the Debtor's claims against the Creditor, on June 10, 2010, three (3) months after the amended complaint was filed in the D.C. Superior Court, the Trustee filed a motion to sell/auction the Debtor's claims, which included the fraud claims against the Creditor, and to approve such sale as a compromise of said claims. The Guarantor opposed the motion; however, the Bankruptcy Court authorized the Trustee to sell the claim subject to an auction between the Creditor and the Guarantor. Richard Boddie's $30,000.00 bid prevailed and the Bankruptcy Court entered an order approving the sale of the claims to Boddie on July 8, 2010.

In the interim period following the March of 2010 Amended Complaint the Guarantor commenced discovery in the D.C. Superior Court case. The Debtor no longer controlled its fraud claims, effective June of 2010. In February of 2011, after discovering through the Guarantor's litigation that RIASO did not have a bank account, the Debtor asked the Trustee to identify the recipient(s) of the $2.9 million payment to RIASO. The Trustee did not answer the specific question.

8

Absent an ample opportunity for the Trustee to answer the question as to the recipient(s) of the funds which were ordered to be paid to RIASO, on April 12, 2011, the Debtor filed a comprehensive Rule 60(b) motion seeking to vacate the Bankruptcy Court order, which effectively determined that RIASO's proof of claim was valid and further, which approved the Trustee's motion to sell the Debtor's claims. In its Rule 60(b) motion, the Debtor argued that new evidence revealed that the Creditor did not have a bank account, did not file any tax returns, had not executed or entered into any third-party written agreements with the purported loan funders, and was managed by the Debtor's loan broker, Leakemariam. Based thereupon, the Debtor argued that RIASO was a sham corporation and lacked standing. See J.A., Vol. II at 581-88. The Debtor further argued that the sale of its claims, including its fraud claim against the Creditor, was inherently unreasonable or, at the very least, premature, since both the Bankruptcy Court and the Trustee lacked critical information about the source of loan monies and how $4.5 million had passed through Boddie's escrow account without any corresponding documentation or disclosure as to whom the loan

9

repayment funds were made. The Debtor also argued that the Bankruptcy Court should necessarily have required the Creditor's attorney to identify the recipients of the $2.9 million intended for RIASO, in light of particular concerns related to the underlying fraud and its potential as a vehicle for money laundering.

On July 1, 2011, the Bankruptcy Court denied the Debtor's motion. In its seventeen (17) page decision, the Bankruptcy Court determined that the evidence proffered under Rule 60(b)(2) could have been discovered by further due diligence on the part of the Debtor prior to the Court's ruling. See J.A., Vol. II at 697-96. The Bankruptcy Court relied heavily upon the Trustee's testimony that the settlement and sale of the Debtor's fraud claims were in the estate's best interests, despite that the Trustee had no basis for his calculation of damages. The court also ruled that the new evidence "didn't push the settlement beyond the lowest point in the range of reasonableness." J.A., Vol. II at 695. As to the Debtor's Rule 60(b)(3) argument, the Bankruptcy Court ruled that the Debtor had not shown by clear and convincing evidence that RIASO had obtained the Court's approval of the compromise of its claim "by

10

failing to disclose information about the source of the funds or its ownership." J.A., Vol. II at 697-98. The Bankruptcy Court further ruled that "even if RIASO did withhold this information from the court, its actions did not influence the judgment to approve the settlement." J.A., Vol. II at 698. Regarding the Debtor's Rule 60(b)(6) argument, the Bankruptcy Court ruled that the Debtor failed to show extraordinary circumstances, and even if it had, it failed to exercise due diligence in pursuing review of the Court's order issued on July 8, 2010.

Debtor argues here that the District Court, by its ruling, erroneously affirmed the Bankruptcy Court's rulings in several respects. First, the Debtor exercised proper due diligence in protecting its claims, given the circumstances. Secondly, the Trustee enjoyed an equal responsibility to protect the Debtor's estate and should not have offered to sell the Debtor's fraud claims to the fraudulent creditor for $15,000.00 at a time when he was knowledgeable about several predicate facts relating to an existing, viable fraud claim against the Broker and Creditor in the Superior Court. Thirdly, the estate enjoyed nearly $3 million dollars from the sale of the Debtor's assets and the pending

11

litigation against the Creditor and Broker was being handled on a contingency fee basis; therefore, the Debtor's estate did have the resources necessary to prosecute the fraud claim, despite the Trustee's contention otherwise.[2] Fourthly, the Trustee's decision, under the circumstances, to sell the Debtor's fraud claim to the fraudulent Creditor violated public policy. Fifthly, the sale of the claim and the determination that the Creditor had a viable proof of claim was inherently unreasonable since the Creditor was a sham entity which lacked standing. To be clear, as a sham corporation it could not have filed a valid proof of claim. Both of the lower court decisions omitted any meaningful discussion whatsoever as to whether RIASO was a sham

---

[2]     Notably, the Debtor did not object to the sale of his property. Hence, even if the case involved a billable-hour retainer, which it did not, the Trustee should have conducted a more formal assessment of the facts and the cost-benefit of investing money from the sale to ascertain, either by investigation or by way of litigation, the extent to which there may have been a fraud on the estate.

corporation and therefore lacked standing. Similarly, by ruling that the Debtor did not diligently pursue its claims, both courts did not address the the suspicious circumstances pursuant to which $4.5 million was transmitted in two instances and distributed through an attorney's escrow account. The initial transaction was made to a settlement company to make the loan to the Debtor. After liquidation of the Debtor's real estate asset, the second transaction was made by the Trustee to Boddie, through his escrow account, to certain unknown individuals or entities without any corroborative documentation which minimally showed a trail which would confirm that distribution of said funds were non-fraudulent and not criminal.

This Court, upon examining the lower courts' decisions and record de novo, should reverse the District Court's decision. In so doing, this Court should determine that the Debtor (1) exercised proper due diligence, (2) proffered new evidence that was unavailable to it prior to

July 8, 2011, (3) that RIASO is a sham corporation, and (4) that RIASO thus lacked standing.[3] Accordingly, this Court should remand this case to order the Bankruptcy Court to reopen the bankruptcy proceedings and require the Trustee to more fully investigate Boddie's distribution of the $2.9 million dollars, including to whom these funds were distributed and the legal justifications therefore. Appellant submits that the lower courts' decisions, absent this information, precludes its ability to ascertain the merits of Appellant's motion and particularly whether the Creditor was in fact a sham corporation. Subject to this information, the lower court can conclusively decide the issues related to the Creditor's standing and the further viability of the Debtor's claims.

---

[3]    This Court should further determine that the new evidence demonstrates clearly and convincingly that a fraud was perpetrated on the Debtor and, possibly, on the Bankruptcy Court. The Creditor's attorney has certified by virtue of RIASO's proof of claim that RIASO lent monies to the Debtor. Indeed, Boddie testified at the hearing on June 30, 2010, that he knew that these monies did not come from RIASO. See J.A., Vol. II at 512-17. Arguably, the newly developed evidence offers more than an indication that the Creditor's proof of claim is itself fraudulent.

## STATEMENT OF FACTS

This case involves several entities. First are the parties: the Debtor, Hope 7 Monroe Street Limited Partnership; the Cappels, limited partners of Hope 7 and Guarantors; RIASO LLC, the purported lender and Creditor; Musse Leakemariam, the real estate loan broker for Hope 7; and Richard Boddie, the Creditor's attorney. Other involved entities include the Leakemariam Family Trust and yet unknown purported lenders.[4]

Prior to November 6, 2006, purported loan broker Leakemariam learned of the Debtor's need for a loan and negotiated with Hope 7 to find a loan. At this point, RIASO did not exist. Nonetheless, Leakemariam knew that the Debtor's property had been appraised at approximately $3.3 million. See J.A., Vol. I at 409-11. Leakemariam then introduced the Debtor to a purported lender, without disclosing the

---

[4]    The District Court decision notes that the Debtor's principal had been imprisoned "[a]t the time the Debtor was originally seeking refinancing…" J.A., Vol. II at 708. The record is clear, however, that at all times referenced herein, the original principal was no longer associated with Hope 7, and therefore played no role whatsoever in the loan negotiations that are at issue in the immediate case.

lender's principal agents or identifying any of the lender's representatives. Leakemariam explained to the Guarantor, that a lender named RIASO approved a loan for $1.6 million. Leakemariam further explained to the Guarantor that the loan would be a short term, eighteen (18) month "bridge loan," but that Leakemariam would assist the Debtor in securing permanent construction financing for the project.

It is undisputed that RIASO was created on November 6, 2006, and that Leakemariam applied for a Certificate of Organization in the District of Columbia on that date. It is also undisputed that neither RIASO nor Leakemariam were licensed brokers in the District of Columbia. See J.A., Vol. I at 417. After November 6, 2006, Leakemariam advised the Debtor that RIASO's attorney, Richard Boddie ("Boddie"), would prepare the loan documents, including a promissory note for $1.6 million, a deed of trust, a loan guaranty agreement, and a subordination agreement. Boddie also arranged the date, time, and place of the settlement.

On November 22, 2006, $1.6 million was transferred from sources other than RIASO to Boddie's escrow account. Said funds were then

16

transferred from Boddie's escrow account to Falcon Title, LLC, for purpose of executing RIASO's purported loan to the Debtor. On November 22, 2006, the Debtor executed a deed of trust, an assignment of rents and security instrument, and other pertinent documents with RIASO, in order to secure the $1.6 million loan. The HUD-1 Statement for this loan reported that RIASO was the purported lender. See J.A., Vol. I at 444-46. As consideration for Leakemariam securing the $1.6 million loan, the Debtor promised that Leakemariam would also serve as its mortgage loan broker for the anticipated long term construction loan. Leakemariam represented to the Debtor that he had personal contacts with hard money lenders who would be willing to make the loan to the Debtor, which would refinance the bridge loan before expiration of the eighteen (18) month term. Leakemariam further stated that the new loan would have more favorable terms and conditions. Accordingly, in June of 2007, the Debtor executed an agreement with Leakemariam pursuant to which he was to be the exclusive source of the future loans for the project. See J.A., Vol. I at 459-60. Sheila Reid ("Reid"), the Debtor's Executive Director, then provided Leakemariam with information about

17

the project that he needed to secure the loan. Unbeknownst to the Debtor, Leakemariam simultaneously managed RIASO. Further, Leakemariam was at least a part owner of RIASO, although his 'family' purportedly owned the predominant interest through a trust. See J.A., Vol. I at 405-06. Therefore, Leakemariam simultaneously controlled both the Creditor and the broker's decisions regarding the Debtor's then outstanding loan, in addition to being responsible for securing any prospective loans for the Debtor for the project. Leakemariam's dual roles and conflicting incentives influenced his interest in the Debtor defaulting on the RIASO loan, rather than securing a more comprehensive loan which would have resulted in a payoff of the RIASO loan. Not surprisingly, Leakemariam never secured the second loan, nor did he make any concerted efforts to do so during the period of the bridge loan. Rather, serving as the Creditor and Debtor's loan broker, he surreptitiously steered the Debtor into defaulting on the $1.6 million bridge loan and ultimately forced Debtor into a foreseeable bankruptcy.

18

On February 23, 2009, Boddie, on behalf of RIASO, noticed the foreclosure of the Debtor's property, noting a debt in the amount of $2,715,000.00. See J.A., Vol. I at 447-449. On April 2, 2009, the Debtor filed a petition for bankruptcy in the Bankruptcy Court, and listed RIASO as one of its creditors "c/o Richard Boddie, 6226 Brandon Ave., Ste. 310." RIASO subsequently filed a proof of claim that mirrored its noted debt in the foreclosure. In August of 2009, at a bankruptcy hearing, the Debtor and Guarantor learned for the first time that Leakemariam was the contact between Boddie and RIASO. At that time, through their then attorney, Nigel Scott ("Scott"), the Debtor and Gurantor filed a civil action in the Superior Court against Leakemariam, RIASO, and Boddie alleging fraud, breach of fiduciary duty, and civil conspiracy. The undersigned subsequently entered an appearance in the Superior Court case given the likelihood of Scott's testimony as a prospective witness. Absent any then known  threshold evidence of fraud on Boddie's part, the plaintiffs in that case, in March of 2010, amended their complaint to dismiss Boddie as a party defendant without prejudice, and also, to withdraw the Debtor as a plaintiff since the

Bankruptcy Trustee controlled the Debtor's claim. When the Superior Court claim was amended, neither the Debtor nor the Guarantor knew who owned RIASO. Nor had RIASO disclosed the source of the funds which it purportedly lent to Debtor. Further, the Debtor was in negotiation with the Trustee regarding the abandonment of its claim. Since the Debtor's claim belonged to the bankruptcy estate it was effectively controlled by the Trustee.

Of particular note, in January of 2010, the Debtor's attorneys entered into discussions with the Trustee regarding abandonment of the well-founded fraud claims against RIASO and Leakemariam, as stated in the Superior Court case. The Trustee seemed well-apprised of the claims and the underlying issues. Pursuant to these discussions, on February 27, 2010, one of Debtor's attorneys, William Johnson ("Johnson"), transmitted to the Trustee a consent motion to relinquish and abandon the Debtor's claims against RIASO and Leakermariam. See J.A., Vol. I at 450-58. In early March, the Trustee indicated that he would take the matter under consideration but was required to first deal with the tenant association's then pending motion regarding the

20

property. Rather than abandon the claim to the Debtor, the Trustee then entered into a separate and distinct negotiation with Boddie and agreed to sell him the claim. On June 10, 2010, the Trustee filed a Motion to Sell the Property Free and Clear of Liens and Interests pursuant to 11 U.S.C. § 363 and to the extent Applicable Approve the transfer of interest as a Compromise and controversy under Bankruptcy Rule 9019 (Claims and Causes of Action against Musse Leakemariam, RIASO, LLC and Richard Boddie).

On June 30, 2010, the Bankruptcy Court held a hearing and issued an order granting said motion on July 8, 2010. That hearing is instructive in several respects. Therein, attorney Johnson urged the Bankruptcy Court that the sale of the Debtor's fraud claims was premature because the claims were not yet developed. Specifically, he stated:

> "Mr. Cappel is a [debtor], and his claims in the D.C. Superior Court case are based upon fraud, and as my colleague, Mr. Temple, will expand upon, those issues have yet to be clearly developed, such that the Trustee could make a full and informed decision as to the value of the claim. The value of the claim, or the lack of valuation of the claim touches upon the reasonableness of the actual purported sale to Mr. Boddie...."

21

J.A., Vol. I at 278. Johnson further urged the Bankruptcy Court to direct the Trustee to look at the totality of the claims and seek out the then unknown, yet critical, evidence which was anticipated in the Superior Court case. See J.A., Vol. I at 279. Johnson advised the Bankruptcy Court that, although not a party in the Superior Court case, the Debtor had engaged in negotiations with the Trustee regarding the abandonment of the fraud claims. See J.A., Vol. I at 280.[5]

Both the Trustee and Boddie testified at the motions hearing on June 3, 2010. The Trustee first stated that he "did a lot of research on this" and represented to the Bankruptcy Court that in his view a settlement of the fraud claims for "$15,000.00" was in the estate's best interest. See J.A., Vol. I at 287-88. Despite all of his 'research,' the Trustee was unable to evaluate the value or significance of the fraud claims. The record indicates that the Trustee was woefully unprepared to properly handle the Debtor's estate. For example, when asked in cross

---

[5]      Neither decision below references Debtor's efforts as early as January 2010 to secure the Trustee's abandonment of the Debtor's claims, the presented Consent Motion to effectuate the abandonment, the absence of any agreement and the ensuing Motion to sell rather than abandon the claim.

22

examination, "Were you aware that loan monies were provided to RIASO from another source on November 23, 2006?," the Trustee responded that he knew the monies were "conveyed to a settlement insurance, you know title company." J.A., Vol. I at 290. At that time the Trustee had made no inquiry into where the loan money came from, nor did the Trustee know who the owners of RIASO were, despite the allegations raised in the Superior Court case on which he had supposedly "did a lot of research." See J.A., Vol. I at 290-91.[6]

As to the possible damages in the Superior Court case, the Bankruptcy Court commented as follows:

> "Well if it (the RIASO loan) was a 16 percent rate of interest, and if the Debtor had gone through a broker who wasn't conflicted and could have landed interest at ten percent, the Debtor's been harmed by reason of accrual of interest at a higher interest rate that would have occurred if it was on an open market."

---

[6]     The Trustee was also asked to discuss the impact of the laws applicable to the claims; however, he refrained from answering a single question regarding those laws, again, despite all the knowledge he supposedly gained from the 'a lot' of time he spent 'researching.' See J.A., Vol. I at 292.

23

J.A., Vol. I at 293. In response to this comment, the Trustee trivialized the fraud claims and commented to the Bankruptcy Court that there was no economic viability of this Debtor to do much of anything. The record demonstrates that the Trustee had not analyzed the Debtor's plausible opportunities and rights, but for the fraud; nor did he comment on the fact that Leakemariam, as broker, had induced the hard money loan by representing to the Debtor that it was a bridge loan. Nor did the Trustee critically analyze the effect of the purported creditor's fraudulent representation and conflict on the securing of the permanent loan and the value therefore of a claim against the Broker for his breach of fiduciary duty, to wit, acting as lender and broker simultaneously, and its claim and damages implications. See J.A., Vol. I at 293. Even more significantly, at that time neither the Debtor nor the Trustee knew the information which is the predicate for Appellant's Rule 60(b) motion.

Boddie testified at that June 2010 hearing that he represented RIASO, and that the company was owned by nine (9) or ten (10) family trusts, but stated that he was unaware as to whether Leakemariam was a beneficiary thereof. When asked where the monies came from that were

24

deposited in his trust account and transmitted to Falcon Title, LLC, Boddie testified that the monies came from three (3) sources: 6400 Second Street, LLC and two other sources, which he could not recall. See J.A., Vol. I at 296. Further, Boddie stated that based upon his conversations with Leakemariam and Leakemariam's father, Leakemariam played no role in the provision of funds to any of these three (3) sources. See J.A., Vol. I at 297. Oddly, Boddie found it relatively easy to testify about some things.  For example, Boddie noted that he 'knew' that Leakemariam was not a broker for any of the three (3) loan sources; however, Boddie found it particularly difficult to 'remember' the answers to substantive questions, such as the actual names of the lenders at issue. See J.A., Vol. I at 295-299.

In its Answers to Plaintiff/Guarantor's interrogatories in the Superior Court case, dated August 2010, RIASO identified its specific owners as: "....The members are The Leila Zaki Trust, The Niat Musse Trust, The Aaron Leakemariam Trust, The Selamawit Leakemariam Trust, The Bofta Leakemariam Trust, The Miriam Leakemariam Trust, The Natay Yonatant Trust, The Musse Leakemariam Trust, The

25

Nazareth Leakemariam Trust, and The Abesari Leakemariam Trust (the "Family Trusts")." J.A., Vol. I at 436. RIASO further responded that it borrowed the $1.6 million for its loan to the Debtor from the L. Smart Corporation, Leakemariam Ogbamichael, and the 6400 2nd Place, LLC, adding that the funds "were deposited to [Boddie's] trust account solely to facilitate a timely release to the title company conducting the closing once the loan documents were executed. This is fairly common practice and serves also to insure that there is no defalcation of the funds prior to closing." J.A., Vol. I at 437-38. The plaintiffs then posed the following interrogatory:

> "State each financial institution in which RIASO has deposited monies since its November 2006 formation. Your answer should specify each account which you've opened and the purpose of the account."

RIASO responded, "None." J.A., Vol. I at 440. The Guarantor further inquired as to the identification of any persons involved in the preparation of RIASO's taxes, and again RIASO answered "None." J.A., Vol. I at 440. Plaintiff Guarantor further inquired:

26

> "Identify any and all written agreements entered into by you with any party and/or with any third persons relative to the making of this loan."

RIASO's answer identified only the pertinent loan documents evidencing an agreement between RIASO and the Debtor, dated November 22, 2006. See J.A., Vol. I at 441-42. On September 23, 2010, the Guarantor Plaintiff in the Superior Court action finally deposed Leakemariam and confirmed that RIASO was owned by ten (10) trusts. See J.A., Vol. I at 405. Leakermariam also testified that the beneficiaries of these ten (10) trusts were his family members, and that his father, Leakemariam Ogbamichael, was trustee for said family trusts. See J.A., Vol. I at 406. Specifically, Leakemariam testified that the trust beneficiaries were his sisters, brothers, one child and himself. See J.A., Vol. I at 406. Leakemariam also admitted that at no time did he disclose to the Debtor, the Guarantor, or any of their attorneys that he and his family held any interest in RIASO. Leakemariam testified that he didn't think that it was important to disclose this information.[7] See J.A., Vol. I

---

[7]     Notably, this fee constituted income to RIASO and, absent a bank account, RIASO could not have made such a payment.

at 407. He also disclosed, for the first time, that he actually managed RIASO and paid himself $52,500.00 as compensation for securing RIASO's loan to the Debtor. See J.A., Vol. I at 413. Leakemariam confirmed that RIASO had never opened a bank account, and that there were no written agreements between RIASO and the family trusts.

On October 10, 2010, the Bankruptcy Trustee issued a Final Report of Payments, which noted a payment in the amount of $2,899,840.17 to RIASO as per its proof of claim, care of attorney Boddie. See J.A., Vol. I at 356-66. On or around February 15, 2011, an attorney for the Debtor contacted the Trustee and inquired as to whether the Trustee confirmed that Boddie actually transmitted funds to RIASO, consistent with RIASO's proof of claim and the Bankruptcy Court's order. See J.A., Vol. I at 431-433. Through the date of the Debtor's motion, and even this filing, the Trustee had not confirmed the extent to which Boddie distributed the received funds to RIASO or otherwise. Absent a detailed response from the Trustee, based upon new evidence received in the Guarantor's pending Superior case, and/or in the interest

28

of justice, the Debtor six (6) months after the Trustee's Final report on Payments filed the underlying Rule 60(b) motion.

## SUMMARY OF ARGUMENT

The District Court erroneously affirmed the Bankruptcy Court's denial of Hope 7 Monroe Street Limited Partnership's Fed. Rule Civ. P. 60(b)(2), (3), and (6) Motion for Reconsideration based upon newly discovered evidence presented after sale of the Debtor's real estate asset. Said new evidence dutifully revealed that the Creditor, a hard money lender, was a fictitious corporation which used its Attorney's escrow account to transfer over $4.5 million, and minimally $2.8 million to unnamed parties. At issue here is the source and legitimacy of the loan monies purportedly from RIASO, LLC to Debtor when in fact RIASO LLC had no business staff, no bank accounts, filed no taxes, and had no documented transactions with any third-party loan sources. To the extent that this Creditor is a sham corporation, its proof of claim and its actions in the Bankruptcy Court to collect any debt obligation are equally void. This court is urged to reverse and remand this case for further findings consistent with the arguments, specifically regarding the recipients of

29

the Trustee's pay out of $2.8 million dollars and the legal justifications

therefore, and any other proceedings thenceforth justified by the record.

## APPLICABLE STANDARD OF APPELLATE REVIEW

"When a court of appeals hears an appeal from an order of a

district court that resolved an appeal from an order of the bankruptcy

court, the court of appeals 'sits as a second court of review and applies

the same standards as the district court.' "*1 Collier on Bankruptcy* ¶ 5.11

(15th ed. rev. 2009) (quoting *S. Technical Coll. v. Hood*, 89 F.3d 1381,

1383 (8th Cir. 1996)); see also *Greater Southeast Community Hosp.*

*Foundation*, *Inc. v. Potter*, 586 F.3d 1, 4 (D.C. Cir. 2009). This Court

reviews questions of law under the de novo standard of review. See

*Energy Action Educ. Foundation v. Andrus*, 631 F.2d 751 (D.C. Cir.

1979) ("[W]hen the district court's action rests on an interpretation of

the applicable law, that interpretation is reviewable fully and *de novo* in

the appellate court.") (footnote omitted). Whereas, refusals to reinstate

under Rule 60(b) are reviewable under the abuse of discretion standard.

See *Bristol Petroleum Corp. v. Harris*, 901 F.2d 165, 167 (D.C. Cir.

1990); *Butler v. Pearson*, 636 F.2d 526, 527 (D.C. Cir. 1980).

30

# ARGUMENT

## I.  THE LOWER COURTS ERRED IN DENYING THE DEBTOR'S RULE 60(b)(2) MOTION.

Pursuant to Fed. Rule Civ. P. 60(b)(2), a court may grant relief from a judgment on the basis of "newly discovered evidence" that the party, despite their "due diligence," could not have discovered in time to move for a new trial pursuant to Rule 59(b). (Emphasis added) To obtain relief from a judgment on the basis of "newly discovered evidence," a party must show that the following requirements are met:

> "(1) the evidence must have been in existence at the time of trial; (2) the evidence must be such that it was not and could not by the exercise of due diligence have been discovered in time to present it in the original proceeding; (3) the evidence must not be merely cumulative or impeaching; and (4) the evidence must be admissible and credible, and of such a material and controlling nature as will probably change the outcome."

*Lans v. Gateway 2000*, *Inc.*, 110 F. Supp. 2d 1, 4 (D.D.C. 2000) (quoting *In re Korean Air Lines Disaster of September 1*, *1983*, 156 F.R.D. 18, 22 (D.D.C. 1994)). The Appellant-Debtor was totally unaware of the newly discovered evidence presented in its motion. Also, but for the Gurantor's ongoing discovery in its Superior Court lawsuit against the broker and

31

creditor, the Appellant-Debtor would not have been able to discover these critical facts, particularly since its claims against the Creditor had been purchased at auction in June 2010 by Boddie.

## A.    The Evidence Must Have Been In Existence At The Time of Trial.

The evidence presented in the Debtor's Rule 60(b)(2) motion as newly discovered evidence was in existence at the time of the June 30, 2010 hearing, but was not disclosed by the Creditor to the Bankruptcy Court, the Trustee or the Debtor. This new evidence, uncovered during discovery in the Guarantor's Superior Court litigation,[8] revealed, in part, the following: Leakemariam managed and owned RIASO; RIASO neither had a bank account nor filed any taxes; nor did it enter into any written or other agreement with any funders of the mortgage loan to the creditor. Further, contrary to its representations, RIASO did not capitalize the loan. Invaraibly, Leakermariam, acting in the dual capacities as lender and borrower, and possibly Boddie, have to have known the details surrounding the loan, especially since the loan monies

---

[8]    At that time, the Trustee owned and controlled the Debtor's fraud claims in the Bankruptcy Court.

came to the Debtor by way of a wire transfer to Boddie's account for the initial loan payment to the Debtor's noteholder. Notwithstanding these facts, the Creditor and Boddie asserted a proof of claim which stated that RIASO was owed $3.3 million. This proof of claim certified to the Bankruptcy Court that RIASO was the Lender in fact of these monies to the Debtor; however, it was not. RIASO was a sham corporation which lacked standing to even bring such a claim. Therefore, RIASO and Boddie necessarily submitted a false proof of claim. Unfortunately, rather than analyze this complex issue, the Bankruptcy Court determined that there was no new evidence presented, stating the following:

> "The new evidence the debtor brings forth does not warrant relief from judgment pursuant to Fed. R. Civ. P. 60(b)(2) because it does not constitute 'newly discovered evidence'...because it is not...of such a material and controlling nature as will probably change the outcome of either the orders overruling the objection to RIASO's proof of claim and directing payment of that claim, or the order granting the trustee's motion to sell the claim to Boddie....As to the order granting the motion to sell the claim, the new evidence does nothing to undermine this court's reasons for approving that sale as a settlement."

J.A., Vol. II at 683. The Bankruptcy Court, citing *Cosoff v. Rodman (In Re W.T. Grant Co.)*, 669 F.2d 599, 608, (2d Cir. 1983), with emphasis,

33

then opined that its responsibility was "to canvas the issues and see whether the settlement fell below the lowest point in the range of reasonableness." Id. In order to make this determination, the Bankruptcy Court would be required to apprise itself of all the facts necessary for an intelligent and objective judgment as to whether a proposed compromise was fair and equitable. Id. at 690-93. The Bankruptcy Court's order, however, is devoid of such an analysis.

In developing its analysis, the Bankruptcy Court overly credited the Trustee despite his lack of knowledge as to many of the laws and critical facts necessary to properly handle the Debtor's estate. Such heavy reliance on the Trustee's clearly questionable testimony effectively precluded the Bankruptcy Court from properly assessing "all the facts necessary for an intelligent and objective judgment." Id. Additionally, the Bankruptcy Court mistakenly concluded that the newly introduced evidence could have been discovered by the Debtor's exercise of due diligence.

**B.    The New Evidence Could Not Have Been Discovered By The Exercise Of Due Diligence In Time To Present It In The Original Proceeding.**

The Debtor exercised reasonable due diligence in this case. The Debtor was initially a plaintiff in the Superior Court case and could only have remained as such if the Trustee had abandoned the claim.  As early as January 2010, the Debtor took steps to secure the Trustee's abandonment of these claims in order that the Debtor could independently pursue them in the D.C. Superior Court action.   Notably the Debtor's negotiation with the Trustee occurred between January and June 2010 and until  the Trustee ultimately determined that he would not abandon the Debtor's claims. To that end, following a series of communications with the Trustee, on or around February 27, 2010, one of Debtor's attorneys drafted a consent motion regarding the abandonment of the Debtor's claims and submitted it to the Trustee. J.A., Vol. I at 450. At that time, the Trustee appeared amenable to this objective; however, the Trustee deferred discussing the matter further until he had addressed the tenant association's then pending motion. Over the course of the next several months, the Debtor continued to

35

dutifully attempt to secure its fraud claims from the Trustee without success.

The Debtor continued to properly exercise its due diligence at the hearing before the Bankruptcy Court in June of 2010. The Debtor insisted to the Bankruptcy Court that any sale of its fraud claims was woefully premature because the factual record thus developed suggested a very serious fraud had taken place, but the factual record underlying such events needed to be more fully developed. Specifically, the Debtor's attorneys made such an argument at the hearing on June 30, 2010, excerpted as follows:

> "Mr. Johnson: Yes, Your honor, and we're not certain, as I stated, that we don't know exactly who the players are yet, because of some delayed discovery, whether the representations made involve parties that are part of the litigation; and two, we actually know it's hard to determine, or impossible to determine, the reasonableness of this particular transaction. We believe that the Trustee, in consideration of the fraud claim, should have at least the opportunity to review the claim in its totality."

J.A., Vol. II at 486. Neither the Bankruptcy Court nor the United States District Court addressed this issue. Hence, the Debtor was reasonably diligent in advancing its interests.  In this respect, the District Court

suggested as follows: "Leakermariam's undisclosed conflict of interest, moreover, put Debtor on notice that the loan might not be above board, leaving it plenty of opportunity to discover the information it presented in its Rule 60(b) motion." J.A. Vol. II at 701. In its analysis, the lower court failed to appreciate the Plaintiff's Catch 22 situation, to wit, that Debtor could not have independently filed a claim on the estate's behalf without the Trustee's authority. Further, contrary to the District Court, this issue was in fact timely raised with the Bankruptcy court. See J.A., Vol. I at 280. Finally, the court suggests that the Debtor could have investigated the circumstances surrounding the real-estate loan or details about RIASO "by other means." The court, however, fails to note what "other means" were available to Appellant given its restrictions and even further a record which showed, for example, the Creditor's Counsel's inability to recall critical information. We submit, that there were no "other means" then available to Debtor other than avenues which were only available to the Debtor in the bankruptcy court. Those avenues existed only if the Debtor were allowed to retain his claim in the Superior court and if his claim was not sold, as here, in the Bankruptcy

court.    The Bankruptcy Trustee's decision to sell the Debtor's claims, which included its fraud claims against the creditor, effectively paralyzed the Debtor's ability to legally pursue claims against the Creditor.[9] Contrary to the Bankruptcy Court's ruling, after the June 2010 sale of Debtor's claims to Boddie, its rights and claims were extinguished and the Trustee, not the Debtor, was in the best position to protect the Debtor's interests.

In this respect, § 541 of the Bankruptcy Code provides that once a bankruptcy case has been open, all legal or equitable interests, including causes of action on behalf of the debtor, are transferred from the debtor to the bankruptcy estate. See 11 U.S.C. § 541(a)(1); *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1471 (D.C. Cir. 1991) (stating that it is "undisputed" that "all legal or equitable interests of the debtor" includes "causes of action that belong to the debtor"). Furthermore, it is well established that a bankruptcy petitioner loses standing for such causes of action and the estate becomes the real party in interest unless the

---

[9]    It is important to reiterate here that the Trustee entered into an agreement to sell the Debtor's fraud claims relating to a multimillion dollar loan to those accused of the fraud for $30,000.00.

bankruptcy trustee abandons the claims. See *In re Lopez*, 283 B.R. 22, 28-29 (9th Cir. 2002); *In re Pace*, 146 B.R. 562, 565-66 (9th Cir. 1992).

Accordingly, once a cause of action becomes the property of the bankruptcy estate, the Bankruptcy Trustee assumes the status of the real party in interest in whose name any claim should be brought. Federal Rule of Civil Procedure 17 requires an action to be brought, and the debtor no longer has standing to pursue that cause of action. See 11 U.S.C. § 323(b); *Toussaint v. Howard Univ.*, 2005 U.S. Dist. LEXIS 38738, at 5-7 (D.D.C. Nov. 8, 2005); *Parker v. Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004); *Cain v. Hyatt*, 101 B.R. 440, 442 (E.D. Pa. 1989) ("After appointment of a trustee, a Chapter 7 debtor no longer has standing to pursue a cause of action which existed at the time the Chapter 7 petition was filed.). "Only the trustee, as representative of the estate, has the authority to prosecute and/or settle such causes of action." *Banks v. County of Allegheny (In re Banks)*, 223 Fed. Appx. 149, 151 (3d Cir. 2007) (holding that a "Chapter 7 trustee was the only person with authority to bring ... a cause of action" after the appointment of a trustee).

It is also significant that the Debtor entered into negotiations with the Trustee in February of 2010 in an effort to secure the Trustee's release of the Debtor's fraud claims. See J.A., Vol. 1 at 450-51.

## C.    The Evidence Herein Was Not Merely Cumulative Or Impeaching.

The newly developed evidence was not merely impeaching or cumulative in nature; rather, the evidence constituted solid proof that the Creditor was a sham and a fictional corporate entity. This evidence was not then known and thus could not have been cumulative. On the other hand, in assessing reasonableness, as argued below, the court gave significant credence to the Trustee's testimony at the hearing, despite significant factual and credibility holes when his testimony was juxtaposed with the testimony given by Boddie. Given the complexity of the immediate loan transaction and its overlay of fraud, it is clear that the lower court's decision was premature and insensitive to the deeper fraud at hand, which Debtor claims affects the viability of the Creditor's proof of claim and standing.

**D.    The New Evidence Was Credible, Admissible, And Of Such a Material and Controlling Nature That It Would Have Changed The Outcome Of The Case.**

The new evidence at issue in the underlying case was quite compelling in its credibility and admissibility. As noted above, the Debtor argued to the Bankruptcy Court that the Creditor was a sham corporation and thus lacked standing to even bring a claim against the Debtor. As a theoretical premise, it is indisputable that a sham corporation, organized to perpetrate and engage in fraudulent activity, has no legal identity and therefore has no standing. As a sham corporation, RIASO could not have made a loan in the absence of a bank account or any agreement with another entity. The sham corporate entity did not make the loan; did not have a bank account; did not enter into any agreement with any third party to make the loan, despite supposedly receiving funds for such a purpose; filed no local, state, or federal taxes associated with the loan transaction; and served as a mere conduit for a very legally-questionable transaction. RIASO thus lacked standing to even pursue a claim in the Bankruptcy Court, as a sham corporation cannot suffer any such injury. In *Feltman v. Prudential Bache Sec.*, 122

41

B.R. 466, 469 (S.D. Fla. 1990), the court found that the Trustee could not act on behalf of a sham corporation, due to such legal entities lack of standing. Further, the *Feltman* court defined such a crooked entity as being "created for the sole purpose of defrauding creditors," and as such were "sham corporations"—not just "legal fictions" but entirely "fictitious." Id.

Notably, neither the Bankruptcy Court, nor the Trustee, addressed this basic issue, to wit, did RIASO actually make the loan? Further, the Creditor never refuted its fictitious corporate status. To this end, the Debtor presented previously unknown, compelling, and outcome determinative evidence which demonstrated that the Creditor was a sham corporate entity, designed only to perpetuate a fraud on the Debtor. This new evidence should have been considered and would have effectively nullified the Creditor's proof of claim. As such, there would be no legal basis for the estate's $2.9 million payment to RIASO, and the funds would have to be refunded to the Debtor.

In sum, the evidence presented by the Debtor in its Rule 60 motion was new evidence, and it could not have been reasonably discovered by

the Debtor any sooner. The Trustee controlled its fraud claims, and invariably viewed the claim in a manner inconsistent with the factual and legal claims stated in the Gurantor's Amended complaint. The Trustee also believed that yet developed, now newly discovered evidence, did not affect the viability of the Creditor's proof of claim.[10]

## II. THE LOWER COURTS ERRED IN DENYING THE DEBTOR'S RULE 60(b)(3) MOTION.

Under Fed. Rule Civ. P. 60(b)(3), a court may grant relief from a final order on the basis of "fraud, misrepresentation, or misconduct by an opposing party." To succeed on a Rule 60(b)(3) motion, a party must "establish by clear and convincing evidence (1) that the adverse party engaged in fraud or other misconduct and (2) that this misconduct prevented the moving party from fully and fairly presenting his case." *Washington v. Patlis*, 916 F.2d 1036, 1039 (5th Cir. 1990) (quoting

---

[10]      It is instructive that the court ordered the Trustee to pay $2.9 million to RIASO as per its proof of claim. The monies were paid to Richard Boddie, who dispersed the funds to entities other than RIASO absent a court order modifying the payout in direct violation of the court order. To the extent that RIASO directed Boddie otherwise, RIASO should have procured a modification of the court order directing payment to RIASO.

43

*Montgomery v. Hall*, 592 F.2d 278, 278-79 (5th Cir. 1979)). This rule is intended "to afford parties relief from judgments which are unfairly obtained, not those which may be factually incorrect." *Diaz v. Methodist Hosp.*, 46 F.3d 492, 496 (5th Cir. 1995). The court may also set aside a final judgment for fraud, misrepresentation, or other misconduct by an adverse party. See Id.; *Mayfair Extension, Inc. v. Magee*, 241 F.2d 453, 454 (D.C. Cir. 1957). Specifically, the movant must show that "such fraud prevented him from fully and fairly presenting his case," and that "the fraud is attributable to the party or, at least, to counsel." *Richardson v. Nat'l R.R. Passenger Corp.*, 150 F.R.D. 1, 7 (D.D.C. 1993).

In its decision, the Bankruptcy Court stated that the Debtor failed to show by clear and convincing evidence that RIASO had fraudulently obtained approval of the settlement by failing to disclose information about the source of its funds or its ownership. The Bankruptcy Court went on to assert that its approval of the settlement was not contingent upon the availability of facts regarding the source of funds or ownership information. Further, the Bankruptcy Court stated that it failed to see how the new evidence would strengthen the Debtor's objection to

RIASO's proof of claim or the Debtor's fraud claim against RIASO, commenting that "...RIASO is free to operate without a bank account, as well as to distribute proceeds of the sale from real property directly to its shareholders and creditors."

With all due respect to the Bankruptcy Court, the new evidence speaks directly to the fraud at hand in two (2) distinct respects. First, the evidence confirms the following facts: (1) RIASO did not have a bank account, (2) RIASO did not make the loan to the Debtor, (3) RIASO did not file any tax returns regarding the income that it would have earned from the loan transaction,[11] (4) RIASO did not enter into any third party agreement with any known money sources to provide the $1.6 million to the Debtor, (5) no third party lender filed a proof of claim.

The new evidence deals a critical blow to RIASO's corporate viability. The new evidence exposes RIASO as a sham and that the entire loan scheme, when viewed in its totality, was designed to fraudulently exploit the Debtor. Now some yet-to-be-known third parties

---

[11]    $2.9 million minus $1.6 million equals a net profit of approximately $1.3 million.

are profiting from a return on the Debtor's victimization, which resulted from the ultimate, foreseeable liquidation of his property due to Leakermariam's underhanded dealings. Again, at no time did the Bankruptcy Court consider the merits of the Debtor's motion regarding whether the Creditor had standing as a sham corporation. Indeed, the law in this jurisdiction is clear as to how sham corporations, when used to deceive, must thus lack standing and legal identity for purpose of said fraudulent engagement, as happened here.[12]

Indeed, if the Debtor were armed with this information prior to June 30, 2010, its claims against the Creditor would have been substantially bolstered. The strong evidentiary ammunition in the form of the Debtor's newly discovered evidence aids in the decryption of the tangled web of deception created by Leakemariam, likely with the aid of

---

[12]    A corporation lacks standing where it is "created for the sole purpose of defrauding" others and as such is a "sham corporation" it is not just "legal fiction" but is it entirely "fictitious. As a theoretical premise, it is indisputable that a sham corporation organized to perpetuate and engage in fraudulent activity has no legal identity and therefore has no legal standing. See *Drabkin v. L & L Constr. Assocs. (In re Latin Inv. Corp.)*, 168 B.R. 1, 7 (D.D.C. 1993) (quoting *Feltman*, 122 B.R. at 473).

his attorney, Boddie. To the extent that this Court gleans from this record evidence of fraud, it should order that Boddie report to the Trustee, with the proper documentation, the persons to whom he paid the $2.9 million. Such an order would allow this Court to know convincingly that the District of Columbia court system has not been used as a conduit for illegal and fraudulent financial conduct. Such documentation would also provide for a complete record, thereby allowing this Court to determine the proper course for moving forward.

## III. THE LOWER COURTS ERRED IN DENYING THE DEBTOR'S RULE 60(b)(6) MOTION.

Pursuant to Fed. Rule Civ. P. 60(b)(6), a court may amend a prior ruling if requested to do so by a party for "any reason that justifies relief." This rule "grants federal courts broad authority to relieve a party from a final judgment upon such terms as are just, provided that the motion is made within a reasonable time and is not premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988). Given that the rule is "essentially

47

boundless," it applies only in "extraordinary" situations and is to be "sparingly used." *Twelve John Does v. District of Columbia*, 841 F.2d 1133, 1140 (D.C. Cir. 1988) (citing *Ackermann v. United States*, 340 U.S. 193, 202, 71 S. Ct. 209, 95 L. Ed. 207 (1950) and *Good Luck Nursing Home, Inc. v. Harris*, 636 F.2d 572, 577 (D.C. Cir. 1980)).

On this issue, the Bankruptcy Court once again improperly determined that the Debtor had not exercised reasonable due diligence in making an effort to discover the source of the loan funds and RIASO's ownership structure. J.A., Vol. II at 683. The Bankruptcy Court further determined that the new facts were not "so central to the litigation" and that the orders in favor of RIASO were not "manifestly unjust." Id. The Debtor respectfully submits that the Bankruptcy Court erred on both counts. First the new facts are indeed central to this litigation. More significantly, the order approving the settlement of the Debtor's fraud claims and the acceptance of RIASO's proof of claim are inherently unjust in light of the newly discovered evidence. These newly discovered facts bolster Debtor's argument that the sale of the claim was both premature and unreasonable. As Debtor then argued, and as

48

confirmed by the Trustee's testimony on June 30 2010, careful analysis was not given to the substance of the Debtor's prospective claims and the attending damages. Further, the Trustee did not know who owned RIASO or the source of monies lent to the Debtor. The absence of this knowledge juxtaposed with the asserted causes of action and damage claims in the Superior Court case suggest that the potential damages for a claim against the Creditor greatly exceeded the $30,000.00 that the Trustee eventually received on behalf the estate.

Additionally, the new evidence raises a deep concern as to whether a defrauding creditor should be allowed to cut short a potential claim against it, particularly when its fraudulent act is the raison d'être for the Debtor's Chapter 7 victimization.

The balance of the equities herein ultimately benefited and rewarded the defrauding party. Such a scenario smells horribly of manifest injustice and presents a dangerous precedent. Fraudulent real estate creditors could intentionally force a debtor into bankruptcy. Then, a Bankruptcy Trustee, in the purported interest of a debtor's estate, could sell for mere crumbs the Debtor's fraud claims against a creditor,

49

thereby ending the creditor's exposure as happened here. Also, despite his contentions, the Trustee in this case enjoyed more than enough resources to litigate the immediate case, given that the attorneys in the Superior Court had taken it on a contingency fee basis. Further, said attorneys had even discussed giving the Trustee a percentage of the recovery in that case as compensation to the estate for the purchase of the claim. The Trustee, however, rejected the Debtor's proposal.

Finally, what can be more extraordinary than the unraveling of a fraudulent real estate scheme designed to defraud the Debtor, his estate, and perhaps even the Trustee? The newly discovered evidence is significant in presenting to this Court critically instructive pieces of a significantly questionable scheme that underlies alleged fraud on the part of Leukermariam, as broker and lender. Such evidence confirms a very simple and fundamental fact: the purported Creditor did not lend the money to the Debtor as represented it to the Bankruptcy Court. These newly discovered facts are critical to viability of Debtor's claim and an evaluation of the Creditor's corporate identity, claim and standing. In short, if this Court finds that the newly discovered evidence indicated

that RIASO did not properly make payment to the Debtor or that RIASO lacked standing, then the Creditor effectively had no claim. To sanction the Creditor's claim against this backdrop is inherently and manifestly unjust to the Debtor. For these reasons, the lower courts' decisions should be overturned on this ground as well.

## **CONCLUSION**

RIASO was clearly a fictitious and sham corporation. It was financially incapable of extending a million dollar real estate loan without any funds or a bank account. It had no assets and was primarily organized and operated to dupe and defraud the Debtor. Leakemariam, by all yardsticks, effectively controlled RIASO, Debtor, the Trusts and its beneficiaries, and ultimately influenced this court's decisions by failing to accurately and completely disclose the Creditor's true status in the immediate bankruptcy. Not one Leakemariam Family Trust filed a proof of claim in the immediate case. Nor did any of the independent, yet disclosed lenders. RIASO's intentional misrepresentations and deliberate omissions have contaminated this bankruptcy proceedings to Leakemariam's, his family Trusts and the unknown lenders' benefit, and

51

to Debtor's significant detriment. Accordingly, and based upon the foregoing arguments and developed record, the Debtor seeks appropriate relief, to wit, vacation of any and all orders in favor of RIASO as a creditor, and reinstatement of the immediate Bankruptcy with all attending rights to Debtor prior to June 30, 2010. Further, Appellant urges this court to remand the immediate case minimally to require the lower court to order RIASO and its attorney to produce a detailed report regarding the source of monies for its purported loan to Debtor, documentation of all monies and identification of all sources of said monies transmitted through the Boddie Trust account, any and all written authorizations made to Boddie from Leakemariam and others, and identification of the recipients of monies received by Boddie from the Bankruptcy Trustee from the sale of Debtor's asset, to include the basis for said distribution and the dates on which said funds were distributed. A hearing should commence thereafter on the underlying financial report to then determine whether the Bankruptcy proceeding should be reopened.

DATED: April 29, 2013

Respectfully submitted,

/s/ Donald M. Temple
Donald M. Temple [#408749]
1101 15th Street, N.W., Suite 910
Washington, D.C. 20005
(202) 628-1101 Telephone
(202) 628-1149 Facsimile
dtemplelaw@gmail.com
Attorney for Appellant Hope 7

## <u>CERTIFICATE OF COMPLIANCE</u>

1.   This brief complies with the type-volume limitation of Fed. R.
App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [*10,336*] words, excluding the parts of the
brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

[    ] this brief uses a monospaced typeface and contains [*state the
number of*] lines of text, excluding the parts of the brief exempted
by Fed. R. App. P. 32(a)(7)(B)(iii).

2.   This brief complies with the typeface requirements of Fed. R. App.
P. 32(a)(5) and the type style requirements of Fed. R. App. P.
32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced
typeface using [*Microsoft Word 2007*] in [*16pt Times New
Roman*]; *or*

[    ] this brief has been prepared in a monospaced typeface using
[*state name and version of word processing program*] with [*state
number of characters per inch and name of type style*].


Dated: <u>April 29, 2013</u>          <u>/s/ Donald M. Temple</u>
                                       *Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

I hereby certify that on this 29th day of April, 2013, I caused this

Brief of Appellant and Joint Appendix to be filed electronically with the

Clerk of the Court using the CM/ECF System, which will send notice of

such filing to the following registered CM/ECF users:

John C. Decker, II                     Richard F. Boddie
ATTORNEY AT LAW                        SLOCUM & BODDIE, P.C.
5207 Dalby Lane                        5400 Shawnee Road, Suite 300
Burke, Virginia  22015                 Alexandria, Virginia  22312
(703) 503-0254                         (703) 451-9001

*Counsel for Appellee*                 *Counsel for Appellee*

I further certify that I caused the required copies of the Brief of

Appellant and Joint Appendix to be hand filed with the Clerk of the

Court.

/s/ Donald M. Temple
*Counsel for Appellant*